Hear ye, hear ye, this Honorable Appellate Court for the Second District is now open. The Honorable Justice Joseph E. Burkett presiding, along with Justice Donald C. Hudson and Justice Liam C. Brennan. The case is No. 2-19-0880, Bank of America, Plaintiff-Appellant v. Joan T. Lampert, Defendant-Appellee. Arguing for the Appellant, Michael Gilman. Arguing for the Appellee, Adrian Vukovic. Very well. Mr. Gilman, you may proceed. Thank you. Good morning, Your Honors. My name is Michael Gilman. I represent the Plaintiff-Appellant, Bank of America, N.A. In this appeal, we seek the reversal of a directed finding entered against Bank of America on its specific performance count and its equivalent count arising from a loan transaction that occurred many years ago. We request the reversal of the directed finding and the remanding of this case to the crowd for the proceedings. With respect to the specific performance count, plaintiffs sought an order directing the borrower, Mrs. Lampert, to comply with a document she signed called the Document Correction and Fees Agreement to cause her to cause the execution of a mortgage to secure a loan. The court found that the plaintiff failed to establish a prima facie case because it found that the Document Correction Agreement did not apply. And it found that it did not apply because the borrower testified that the mortgage that plaintiffs sought to be executed contained a escrow provision, and the borrower testified that she objected to the escrow provision. On the proposition that the agreement, that the Document Correction Agreement, is not limited to any particular document, for example, so in other words, it's not limited to a mortgage that included an escrow provision. It says that the agreement says that she would execute additional documentation for the loan and agreed that regardless of the reason for the failure to sign any loan documentation, she would comply with the letter of request to execute and acknowledge documents that were missing. In this case, the document that was missing was a mortgage. Although the borrower testified that she objected to the escrow provision and that she did not know the loan closed, she also testified at trial that at the time of trial, she did, in fact, know that the loan closed. So she limited her testimony to asserting that immediately after the closing, she did not know that the loan closed. However, her conduct disputes that position because she testified that prior to the closing, she was making payments on two loans. Two loans that were being refinanced by this new loan. And then after the closing, she was making payments on only one loan. And therefore, she must have known that the closing had occurred and that the proceeds were dispersed and that the new loan was in place. Additionally, and this goes to the escrow issue, those payments she made included escrow payments. She knew after the closing that she was making payments on this new loan and that those payments included escrow provisions. Based on that conduct, it's our position that she did in fact agree to an escrow in the mortgage. And the court found that she did. But we believe that finding is against the manifest way of the evidence. But in terms of whether the document correction agreement applies, it's our position that even if she did not agree to the escrow, the court could still compel her to cause the execution of a mortgage that did not include an escrow provision. That would be in keeping with the terms of the document correction agreement, which in essence says that the borrower will execute or cause to be executed documents to reflect the agreement of the parties, reflect the terms of the loan. And if the court's finding that one of the terms of the loan did not include an escrow provision, then the court had the ability and should have in our position entered an order, well, I strike that, not granting the directed finding and ultimately find in favor of a plaintiff on the grounds and compel Ms. Lampert to cause the request of that relief in its post-trial motion presented after the court entered the directed finding. The court entered directed finding in essence finding that there was no agreement by Ms. Lampert to an escrow that was not plaintiff's initial position. Upon the entry of that finding, plaintiff requested that instead the escrow agreement, I'm sorry, the mortgage be executed without an escrow provision. We believe that's within the ability of the court. It's very clear from the record. I don't think, and I think the judge found that the borrower admitted that she expected the loan to be secured, that he knew that she had a contact or caused the land trustee to execute the mortgage. And that and that to the extent, as I said before, to the extent that she did not cause the execution of the mortgage due to the escrow provision, that could have been resolved by the execution of the mortgage. Even if the agreement applied to these facts, the plaintiff Bank of America failed to establish that the loan proceeds were dispersed. That finding is against the manifest way of the evidence. Ms. Lampert admitted in her response to undisputed facts, which the court took judicial notice of, at least to the extent there were judicial admissions, that the loan proceeds did disperse. As I said before, she said that she, at the time of trial, knew the loan proceeds dispersed. And her testimony that immediately after the closing, she did not know that the loan proceeds had dispersed is refuted by her actual conduct, where she made payments on one of the escrow provisions. Consequently, I think that the trial court's findings that the correction agreement did not apply, excuse me, and therefore claiming that Bank of America did not present a primary case was an error. And the trial court's finding that the loan proceeds did not disperse was against the manifest way of the evidence. Another issue raised by the defendants in support of the trial court's decision was that record title of the property was held by the land trust, not Ms. Lampert. And therefore, plaintiff could not compel Ms. Lampert to cause the execution of the mortgage. The case law, and I think the trial court agreed, the case law shows that if there's a land trust where the sole beneficiary and the person with the sole power of direction agrees to a contract, if you will, that person can't be compelled to cause a land trust to execute that contract. And there was a case we cited in our brief, Payne-Wetzel versus Gittles, which supports that proposition. There's another issue raised by the defendants that the mortgage was not made an exhibit in the case. Well, our position is that, first of all, the essential document in this case is the document correction agreement, not the mortgage. The document correction agreement is what would compel the borrower to cause the execution of the mortgage. The mortgage is somewhat of a collateral document. But the mortgage was not identified as an exhibit. It was made part of the record. The plaintiff requested the court to take judicial notice of the borrower, Ms. Lampert's response to the request, I'm sorry, response to undisputed facts. Those undisputed facts identified the um, in that response, that she did receive a letter with the mortgage. And in trial, defendants agreed and did not make an issue of the fact that the letter was sent and received. And that letter included the mortgage. So the mortgage was in fact, before the court. That's a mortgage that was, as I said before, attached to the letter and also attached to the um, state of the undisputed facts. For those reasons, we believe that the, um, finding, um, on the, on the, um, specific performance count should be reversed. The second count of the complaint, which the court also entered a directive finding on, sought an equitable lien. And initially there was an issue about whether the concept that an equitable lien is a remedy, not a cause of action. But the court construed, um, count to that lien as in essence, a request for a declaratory judgment that asked a request that the court declared that under these facts, um, plaintiff has a right to an equitable lien. And obviously the, the claim for a lien on a property was So the trial court, um, I don't believe directed the finding because I know the theory that the, um, count that that bullying is a remedy, not a, not a cause of action. But, and I think the facts and the evidence produced at trial show that an equitable lien was established. An equitable lien is a right to have property subject, subjected to the payment of a claim. And it can arise with the parties expressed in writing their intention to make a particular property security for debt, or there has been a promise to convey or sign the property as In this case, there's no dispute that Ms. Lampert intended to have the property to secure the loan. I don't think Ms. Lampert, um, denies it. And the trial court, in fact, found that there was an intent. And there's also, um, an understanding or Calico father's understanding or intent By Ms. Lampert to direct the land trustee to execute a document to Income of the property. The trial court, um, finding against an equitable lien was I think twofold. One that, um, the court said that it could not, um, unilaterally impose an equitable lien on the property. But again, I think the evidence that the bower and the lender intended the loan to be secured by a mortgage or if not a mortgage and otherwise service security for the loan. Establishes that it's not a, the court's not unilaterally imposing an equitable lien, it's just imposing what the terms of the parties agreement, imposing on the property, the terms of the parties. The court also found that plaintiff did not establish the loan proceeds dispersed. And again, it's our position that the record clearly shows that the loan proceeds dispersed and this evidence by Mrs. Ms. Lampert's admission that at a time of trial, she knew the loan proceeds had dispersed. Her only contention was that immediately after the closing, she did not, did not know the loan dispersed. But again, it's our position that, that if you will self-serving or that, that conclusion is refuted by her actual conduct where she stopped making payments on two loans and started making payments on only one loan after closing. That clearly established that she knew that the proceeds funded. Therefore, I think the trial court's finding against Bank of America on the equitable lien count should be reversed. The couple other issues that we raise on appeal, one is that it's our position the court erred in denying plaintiff's motion for lien to file a second amendment complaint. And that second amendment complaint sought to enhance the equitable lien count by including the theory of the claim of subrogation arising from the fact that the loan proceeds paid off to prior mortgages on the property. And by virtue under the equitable subrogation theory, by doing so the plaintiff can step into the shoes of the prior mortgagees and therefore have a secured interest in the property. And then it also added a third count to foreclose on the equitable lien. The main, the primary objection was the timing of the filing of this second amendment complaint. Illinois law is clear that the late filing, if you will, of an amended pleading is not a basis to deny leave to appeal, provided that the opposing party is not prejudiced as a result of that. And in this case, there would have been absolutely no prejudice because all the facts that were alleged in the proposed second amendment complaint were known by the parties. There's nothing new. It was just setting them, organizing them, or using them to support different theories. But all the facts were known. There would be no need for any further discovery. And the parties could have proceeded as was. So therefore, we think that the trial court erred in denying that motion for leave to file an amended complaint. And the third issue- Judge Newman, do you want to save time for questions? Okay. That's fine. I'll reserve time for questions now. Okay. Justice Brennan, your questions. The document correction agreement, I keep reading this language and I have this question. Depending on which part I focus on, I reach a different conclusion. But ultimately, it seems to me it obligates Lambert to make a certain correction specifically to correct something or to execute a document to replace or correct. There's nothing to replace here because it wasn't executed in the first place. And there's nothing to correct because it wasn't executed in the first place. Can you just address that? Because it seems to me that we don't have something to replace and we don't have something to correct. Well, the document correction agreement provides that it applies regardless of the reason, and I'm quoting from the agreement, regardless of the reason for the failure to sign any loan documentation. So we have a mortgage here that Ms. Lambert states she didn't sign because it included an escrow provision. So the fact is- I agree. And let me just interrupt and I apologize because I really want to address this issue. I agree that regardless of the reason she has to comply with this provision, necessary to replace or correct something that's missing. But what are we replacing or what are we correcting? Well, the correction would be the absence of a mortgage. Because I think the purpose of this document that is supposed to reflect the terms of the loan is for some reason not there. It's missing, it's lost, it contains an error, whatever the reason, that can be cured. The parties will cure that by executing the document that will reflect the party's agreement as to the terms of the loan. But here you're attempting to cure her refusal to enter into the agreement. Well, I mean, our initial position is that she, while she testified that she didn't execute the mortgage because it contained an escrow provision, her conduct, i.e. paying escrow right after the closing, knowing that the loan she was making payments on was a new loan, is conduct that shows that she really did not object to the, not saying her testimony, did not but even if she did, then the agreement of the parties would have been a mortgage without an escrow provision. So we're asking that she be compelled to direct the land trustee to execute a mortgage without a escrow provision. But I mean, there is no signed document, but there is a Lambert's testimony to delete the escrow provision and then bottom line to accurately reflect the terms of the loan. Because without that document, we in essence have an unsecured loan. And that wasn't the agreement of the parties. The agreement of the parties was that the loan would be secure. And how do we decide the terms of the agreement? I mean, obviously, monthly payments are a function of the interest rate, the escrow amount as it relates to taxes or insurance. I mean, how do we pick the number? That, well, the, the number, what number are you talking about? The monthly payment. I mean, I would assume that's an essential part of the agreement that you say she entered into and yet there's this dispute. No, well, the, the, the, the monthly payment is contained in the note. There's a note executed and she admits she signed the note and the note sets forth the interest rate and the loan amount and the monthly payment. The note does not talk about escrow. The mortgage has revision talking about escrow and, and, and with respect to the escrow, the mortgage does not identify the amount of the escrow. The amount of the escrow is, is adjusted, frankly, is adjusted annually based on, and I believe it's RESPA controls how much can be charged for escrow. And it depends on what the actual real estate taxes are in the escrow. Sure. So the only, and she tested this lamp and testified that the only objection she had, well, that's why the only objection she had was the escrow revision. She also said she objected to the interest rate, but as I just said, and I think if you look at the copies of the, the mortgage that are part of the record, the interest rate is not shown in the mortgage. Did she deny seeing the corrected mortgage attached to the 2015 correspondence at trial? No, she admits receiving the letter with the attachments, but she denies that the mortgage was attached at trial. I believe what she was testifying to that. I think what she was saying was that the mortgage was not the mortgage she agreed to sign. And that was her denial. I don't think, I don't believe that she denied that the copies of the mortgage were enclosed in the correspondence from Bank of America's attorney. Okay. What relevance do you attach to her testimony that she did not receive the 8,000 plus dollars that the HUD statement suggests she received? Is there any relevance described to that in your opinion? Well, initially it's our position that she judicially admitted receiving all the, that all the loan proceeds were dispersed, including the, the, the $8,700 change that's shown in the, in the closing statement. But even if... Can I ask a question about that? Sure. I, I'm a big fan of judicial admissions, but is it not the case that if you ask questions regarding the judicial admissions at trial, I don't even think you need to obtain contrary evidence, but let's assume for the sake that you do, and you obtain contrary evidence, you waive the judicial admission? Well, I understand that the case law on that in this case though, well, first of all, she was testifying as an adverse witness. Is there any case law saying that this rule does not apply if someone's testifying as an adverse witness? I believe I cited a case in the reply brief. I have to, I, I have to pull it up. I believe I cited a case in support of that proposition. But she also volunteered that she didn't receive that money. It wasn't a natural response to the question that was asked, but, but even if, okay, so even if though she's deemed that the judicial admission was waived, and by the way, she also testified at trial, independent of the judicial admission, she also testified at trial that she received all the postage. So that has to be countered with her claim that at the time she's, I think she testified at the time she did not receive the $8,700. We don't know if at a subsequent time she may have received it, but she said, I believe her direct testimony was at that time she did not receive $8,700. But even if she didn't receive that $8,700, that only goes to amount of the loan, if you will, not whether a loan was made. If you didn't back, if she did not, in fact, receive the funds, then either loan amount gets reduced or she's entitled to receive those funds. But I don't believe it goes to the fact whether, whether a loan was made or whether it should be secured by, by a mortgage on the property. Thank you very much. I do not have any additional questions. Thank you. Yes, thanks. Good morning, Mr. Gilman. Good morning. Gilman, one of your arguments is that the court erred in denying the bank's motion for leave to file a second amended complaint. And then looking at the record, did you ever provide a transcript of the hearing after which the court denied the bank's motion or a bystander's report? Anything like that? No, no, we did not. I don't believe, I don't believe, I'm not certain that the, that the hearing was recorded, but we did not provide a transcript or a bystander's report. My question becomes, and there is no written findings in the record illuminating the trial court's reasoning. On what basis do we determine that the trial court abused its discretion in denying your motion? How do we do that in the absence of a record? The response to the motion primarily argued that the, that it was untimely. And I think that the conclusion from that is that the court agreed that it was untimely and therefore denied the motion. But there is no record of exactly what happened at that hearing. Are you aware of the couch of the case of Fouch versus O'Brien that holds where an record of the proceedings, it will be presumed that the trial court entered an order conforming with the law? Are you aware of that? I'm aware of that concept. Yes. Moving on, I'm intrigued by your interpretation of the document correction agreement, which I think you alluded to when Justice Brennan did too, contains the language, better the mortgagee is going to execute, acknowledge, uh, and deliver corrections to correct the lost misplaced or missing document. Here, there is no missing mortgage or lost mortgage, is there? I believe there is a missing mortgage, a missing executed mortgage. It's not lost in the sense of at one point someone had it and it's no longer there. But I believe that, um, that there was no mortgage that was executed, which the agreement starts off saying, regardless of the failure to sign any loan documentation, the mortgage is a loan documentation that was not signed. And you never introduced, I think you admitted any mortgage in the trial court, correct? Well, no, I, I don't admit that your honor. We, um, the mortgage was attached to the letter and the letter was, um, was identified in plaintiff's statement of undisputed facts and the borrower responded admitting, um, receipt of the letter. And we requested the trial court to take traditional notice, um, of, of that document, of those, of those pleadings, the statement of undisputed facts and response. And the trial judge said that, um, he would consider to the extent it contained judicial missions. So I should have said you didn't introduce an executed mortgage, correct? Signed by Mrs. Lampert, correct? Oh, correct. Correct. That's, that's correct. You're right. How do you, you're hanging your hat on the document correction agreement. Okay. How does the plain reading of that document require, um, the bower to sign a mortgage with the terms that they specifically rejected? Well, how does that happen? Well, first of all, it's our position that, um, by her conduct, she agreed to an escrow because as I've said before, she, um, immediately before the closing, she was paying on two mortgages after the closing was paying on one mortgage, which shows that she knew that the loan, the closing, um, completed funds were dispersed in the closing completed. And those payments included the, if she was making escrow payments pursuant to the terms of the new mortgage, which constitutes conduct, I'm showing an agreement to an escrow. But even if, even if she didn't agree to escrow, that's, that's a determination. Then there's nothing that prohibits the court from, um, deleting the escrow provision from the mortgage and requiring it's execution. It kind of similar to any situation where a plaintiff might request certain relief and the court, um, find that the plan is not entitled to all of relief, but it's entitled to some of the relief. Um, in this case, if the court found that, that, um, plan, it was entitled to an executed mortgage, but not what that included natural vision, the court could have. So hold it. And that was the only provision that the So that was the only, only issue, only matter of dispute. Well, would you agree that an agreement on whether to pay escrow taxes and insurance payments would be considered normally to be an essential part of a mortgage agreement? Correct? Well, it's a standard provision in a mortgage agreement. There are, the actual provision says that it can be waived, but it is, it is a, in your, in your typical, I fancy how the percentage wise, but often many times in a residential mortgage, it includes an escrow provision, but many times those are waived as well. You say way, but how does the waiver tie into what's authorized by this document correction agreement and thinking this through and hearing your argument out to its logical extension, then it's your position. Anytime essential terms are missing from a mortgage document the lender can fill them, fill those in. Where is there a meeting of the minds then to make it a valid agreement? Well, the means of the mind would be the fact that according to Ms. Lampert, she testified that he did not agree to the escrow revision. The loan never, nevertheless closed and the lender dispersed funds. So the lender is dispersing funds knowing that Ms. Lampert's not agreeing to an escrow provision, then our, then the lender is in essence agreeing to no escrow provision. Otherwise it would have not closed. It would not have closed the loan. All right. Closing the loan. I have to ask you, did the closer ever signed the HUD one agreement verifying that the loan closed? Did the closer ever do that? The record doesn't include a executed settlement statement. I have not otherwise looked at documents that were not part of the record. Isn't that a relevant normal part of a closing? It is typical of closing that the closing agent would execute the closing statement. Yes. All right. And the final question I have is, didn't the trial court find Mrs. Lampert, notwithstanding the inconsistencies you pointed out, didn't the trial court find her to be credible? The trial court did. The trial court did. I think though that, I don't think the court frankly picked up on the contradictions in her testimony. In particular that she, before the closing signed, paid, made payments on two loans. And after the closing, she made payments on only one loan. And in fact, when the court rendered its findings, it too referred to the fact that after the, it too said that after the closing, you continue to make payments on the loans, plural loans. But I don't believe that the trial court picked up on her testimony. All right. But would you agree, my last question is that it's generally considered to be within the province of the trial court to judge the credibility of the witnesses and the weight to be given to their testimony. Isn't that true? That's true. That's true. All right. Thank you, Mr. Gilman. I have no questions. All right, Mr. Gilman. I have no questions. Mr. Vukovic. Thank you. Thank you. Good morning. May it please the court, Adrian Vukovic on behalf of defendants at police, Joan Lampert and the land trust company. I think the most important point about this appeal is that it's an appeal of a decision made after a bench trial. And it's an appeal of a trial court's decision to deny leave to amend, which is based on an abusive discretion standard. So both of these standards are the most deferential standards to the trial court when a party is seeking an appeal of those decisions. And not only did the bank not prove its case in the trial court, now on appeal it has even a more difficult standard precisely because of the deference given to the trial court on those two standards. As Justice Hudson just pointed out, on a directed finding in a bench trial, the court has the ability to and in fact did weigh the evidence and assess the credibility of the one witness who testified, the defendant, and determined that the bank failed to prove its case. So there's nothing in this appeal and nothing said by Mr. Gilman this morning that changes, that gives grounds to change the decision by the trial court. I think one of the more interesting things about this appeal or this case is you have a bank who is trying to stretch the record to make it say what it wants, whether it's the document correction form or Ms. Lambert's testimony, or even the idea that somehow there's supposed to be a rewriting of a document after the fact to justify or support a specific performance case. I mean, this is not what goes on in the legal system when the bank is the party. I'm never on the side where I'm representing the lender. I've always got David, not Goliath. And the legal system is very kind to lenders, whether it's the Credit Agreement Act or the ability to prove the existence of a loan and that a loan funded simply through the introduction of records as business records. And even in a foreclosure case now, we have a watered down means to get records in under Rule 113. And so in this case, what is really unbelievable is that a bank comes into court 10 years after a failed loan transaction seeking specific performance on a verified complaint that a particular mortgage attached to the first amended complaint must be executed as the remedy on a specific performance case. And yet there is absolutely no bank witness called. There is no records witness called simply to put records in and establish the bank's case. You have no payoff letter. You have not a funded the loan. And now today on appeal, you get a different argument, which is, well, using the document correction form, the court could rewrite the mortgage different than the one attached to the first amended complaint and fit what the bank wanted. But that's not specific performance works. Specific performance is the existence of a clear definitive agreement. That's the bank's required element to prove. And the only testimony on that was that Mrs. Lampert did not agree to the mortgage, period. She didn't agree to Section 3, which were the escrow provisions. That was what was attached to the first amended complaint, verified that that was the mortgage that she was supposed to sign. And that document was never put into evidence, nor was any other mortgage. And her unrefuted testimony that she did not agree to its terms kills the bank's case. The fact that Mr. Lampert, excuse me, Mr. Gilman says that the document could be modified just goes to further the point that there was no clear agreement that could be the subject of a specific performance case. So they completely failed. And then on a fallback to now say that the essential document is not the mortgage, but is the document correction agreement, makes no sense. That was signed. It was Exhibit 1 admitted into evidence. But I think as the court has already picked up on, that's a document that's used to effectuate a situation or another document when a closing has actually occurred. In this case, the unrefuted testimony by Ms. Lampert, the only testimony is that no closing occurred. She stopped it. That's in R33 of the transcript because the mortgage document did not say what she agreed to and the closer left. So you cannot have a document correction form that means anything when no closing has occurred. And as already brought out by the court, you can't use it to force an agreement where there is no agreement. Then there was no evidence of a loss, misplaced, inaccurate, anything. There was only evidence that Ms. Lampert did not agree to the mortgage. The bank completely failed to prove its case on the specific performance claim. Regarding the equitable lien claim, that claim failed precisely because the trial court taking into account all of the evidence and the credibility of Ms. Lampert determined that the bank failed to prove that it had funded the loan. That was the reason the trial court gave, buttressed by its assessment of the credibility of the one witness and the testimony which she gave. The court also correctly looked at the HUD, which was plaintiff's, the bank's, exhibit 5C. And the critical part of that document is not only is it not signed by the lender, but the part where the lender is supposed to sign, the purpose of signing is the language, I have caused or will cause the funds to be dispersed in accordance with this statement. There's no proof that the funding occurred because the HUD was unsigned and Ms. Lampert testified that she did not get the cash to borrower that one would have received if a loan had funded. That was the bank's obligation to prove whether to establish the specific performance case or the equitable lien case. And after considering all the evidence, including the credibility, the trial court determined that the bank failed to prove that aspect of its case. And deference must be given to the assessment of credibility. So then we get to was the bank somehow deprived of putting on its case or amending its completings or doing something so that it prevailed? And put aside the fact that the transcript's not in the record for the motion to file a second amended complaint. What Mr. Gilman is not mentioning to you is consider the Loyola factors. This case was already four years old when the bank tried to file a second amended complaint. So yes, that's a timing issue. It already amended once. The court had already amended. The most important thing is on that second amended complaint, they now came out with another mortgage. It's a different mortgage document than is attached to the first amended verified complaint which said this is the mortgage that should have been signed at closing. Now, 28 days before trial, four years later, they come out with a second different mortgage and say, this is a mortgage. Mind you, when they sent that letter which is exhibit D to the first amended complaint, it's in the appendix at A40, that letter to Ms. Lampert, that had a letter with it which said that the mortgage was executed but not recorded. So the bank kept changing its story. First amended complaint, one mortgage. Proposed second amended complaint, another mortgage. Letter to the borrower says it's an executed document. But we all know whether it's by Lampert's testimony or even Mr. Gilman's statements to date, it was never executed. So there was every reason for the trial court to deny leave to file the second amended complaint. Well within its discretion, absolute prejudice to the defendants after four years to now have a new supposed mortgage brought into the picture 28 days before trial. So the court ruled absolutely correctly on that. Just last, Mr. Gilman referred to this Payne-Wetzel case. It's 174, 389. Case has no application. It was decided on a motion to dismiss and reversed after the motion was granted. In that case, the broker sued and put a lien on the property based on the signature of a party who was a beneficiary to a land trust. So the court accepted the allegations as true for purposes of the motion to dismiss and simply said there was authority of the person to bind the real estate broker and a lien could be recorded against the property. That's nothing like this case, which was a failed loan transaction, went to trial, and a failure of proof by the bank. So there's no question that the trial court, a very experienced trial judge, and Judge Baronis, who considered all of the evidence, ruled correctly. Welcome. I welcome your questions if you have any. Thank you, Mr. Vukovic. Justice Brennan, your questions, and we do have other cases on the call, Go ahead, Justice Brennan. It seems to me that for Ms. Lampert to prevail, we're ignoring a lot of equities, and maybe that's okay. We're following strict rules and standards of view and whatnot. But in the end, in her deposition, she did testify that these loans funded, did she not? I think, well, first of all, the deposition is not admissible evidence at trial. And so it doesn't matter what she testified in her deposition. Perhaps it could have been a point of impeachment. Let me interrupt you, because that's a fair point. And let me just redirect the question then. Yes, sir. It's clear that she continued paying, and she only made one payments right after this failed closing. And it could not have escaped her that she was paying only one payment and not two payments. Is that not a fair analysis? I think the most fair analysis on that point is that there was some possibly inconsistent testimony. And I'm looking at R58 of the trial transcript, where of course she's the only one testifying. And she was asked this question. After the closing, you stopped paying on the prior loans and started making payments on the subject loan. Is that correct? Answer, no, that is not correct. Question, it's not correct. Answer, it wasn't what I thought. That's what I was trying to explain to you. It was not what I thought that I was paying. I thought that when I did not sign all of the documents on the 26th, I was under the impression that I was continuing to pay was the old loan. That's the reality of the situation. It was the same bank, and I thought it was the old loan because I never, the closer left, and I never closed on the, so I did not. I have to tell you that I did not. So she's saying in that part of the transcript that she did not stop paying the prior loans and started paying the new loan. Now, I'll grant you it's imperfect, but I as her lawyer did not ask her a single question. And when you go to trial, you make decisions as the trial lawyer about what you're going to ask the witness. This is an adverse witness, doesn't matter, same issue for a trial lawyer. You stop, you start, you take what you have, you make decisions about how far you're going to ask the witness. And in this case, whether it's the so-called admission that Mr. Gilman has pushed in his brief or this testimony about the prior loans, there is testimony by Ms. Lampert that she did not get the money from the, that's reflected on the HUD, that she stopped the closing and that she believed she was paying the old loans. That's enough for a trial judge who's assessing credibility and weighing the evidence, particularly that HUD document, and particularly with the fact that all a bank has to do is bring in a business records witness and prove its case, show us a wire, show us a payoff, show us a something. They didn't show anything. So I don't think there's an inequitable situation here. There is just a failure to prove a case. It wasn't her burden to prove anything. What's your opinion of the Capron case that they cite to get around the judicial admission issue? That's not, I don't agree with it. I think we cited the Roe case, which I believe was an Illinois Supreme Court case. And I think that it's the same issue again, not to belabor the point on a trial, trial lawyers got to be careful and you open the door like people do it with expert witnesses and then cry on appeal that it wasn't fair, but you open the door and that's what happened here. That they may have had a statement that they thought was good, but when you put a witness on and you get into the issue, you've waived your position that there's a solid admission that's binding and that's the end of it. So you've got testimony by Ms. Lampert and even Exhibit 5C, the HUD, they brought that out and that document, which would be the most reliable form of evidence as to whether the transaction closed and was funded, says did not close, did not fund. All right. Thank you. I have no other questions. Thank you. Justice Hudson, your questions. Yes. Good morning, Mr. Vukovic. I have a question. Yes, sir. Good morning. As we know under the case law, one way an equitable lien can be found is where considerations of fairness and justice would require imposing a lien even without an express agreement between the parties. So in light of the fact that Ms. Lampert acknowledged that she was, after this purported closing, she was making only one payment instead of two, the interest rate had changed and this went on for five years. Tell us why that does not, in the interest of fairness, give rise to an equitable lien? Because that statement is not the only statement that was made at trial. The statements at trial also included that under the loan that she had at the time that existed prior to the failed closing, it contained escrow amounts for taxes and insurance and that was one of the reasons that she had hoped to refinance. So after the failed closing, she continued to pay a loan which had these escrow amounts. It wasn't as if anything had changed. The fact that it's one payment, two payments, I mean banks assign loans or sell loans. I don't think that that's sufficient evidence to put a lien on someone's property. I also think that that doesn't work in this case because the transaction that was supposed to happen is a consumer loan transaction, a consumer mortgage. And what the bank is saying is that let's dispense with all of the protections that are in place for a consumer mortgage, a truth in lending statement, a RESPA referred to by Mr. Vukovic before a lien is placed on a consumer's property. So there's nothing inequitable about the result because the bank failed to prove its case. All right, thank you. Thank you. Mr. Vukovic, your point is that I take it that the bank was outlawed, right? Well, that would be terribly egocentric. No, they didn't put in evidence to prove their case. I don't know why that documents, which if they existed, were not put into evidence. And if it was a jury trial, there would be, as you know, there would be an instruction at times where one party who has documents doesn't produce them, that is likely that they were withheld. I think it's the opposite here. There was no closing unrefuted. There were no documents to demonstrate that the loan funded. And because of that, the lawyer either could not, not able, regardless, there was not proof that the transaction closed and therefore the bank failed to prove its case. I was just another lawyer that day, but the other side did not prove its case. But you acknowledge in your response to one of Justice Brennan's questions that there was impeachment, that your client was impeached, but in your view, that was not the case. Is that right? That's a little different to correct, Your Honor, if I may. I said that if Ms. Lampert had said that in her deposition, it could have been used for impeachment. If you look at the transcript, there was one effort to impeach Ms. Lampert, which failed. And I brought to the attention of the trial court that it was an improper impeachment and nothing became of it. But even if the witness had been impeached once, let's just say for the sake of argument, it's the whole testimony taken into account by the one party or one person in this world who gets to judge the credibility of witnesses, the trial judge. And that's what happened. And the order so reflects. Thank you, Mr. Gilman, Mr. Vukovich. Thank you, Your Honor. Mr. Gilman? Yes. I would just like to make a few points concerning responsive argument. First of all, I did say in our opening statement that the trial judge, there's difference in the trial judge and determination of credibility. But when the manifest weight of the evidence goes against the credibility determination of the judge, I think that controls. And just to quickly reiterate, I think the evidence clearly shows that the borrower knew the loan closed. After the closing, she stopped making payments on both loans. And she admitted that the loan proceeds were dispersed. And in fact, the trial court, in rendering his findings, talked about the fact that she was still making payments on the loans. So I believe that manifest way of the evidence defeats the deference that is given to the trial court in terms of the credibility of witnesses. There's also been discussion about this so-called failed loan transaction. Well, it really wasn't a failed loan transaction because as I indicated, the manifest way of the evidence shows that the loan proceeds were dispersed. I mean, the prior mortgage, prior loans were paid off. And Ms. Lambert admitted that. It's really not a failed loan transaction. Counsel argued that on a specific performance action, the court can't determine the terms of an agreement or can't rewrite the agreement. But that's not what's being asked here. We're asking the court to determine what the agreement was. And it was initially, it was our position when we filed the complaint that the borrower had agreed to the terms of trial, that she didn't agree to the terms of the mortgage. So the next step is for the court to determine what was the agreement of the parties. Not rewriting the agreement, but what was the agreement of the parties? The Bank of America did fund the loan after the so-called failed transaction. And that's why I questioned the term failed loan transaction. The loan was funded. In terms of the different mortgages that counsel spoke about, the copy of the mortgage that was attached to the proposed second amended complaint was frankly erroneously attached. It's marked Exhibit A. And Exhibit A, according to the complaint, is a copy of the assignment of the mortgage. There's no representation in the second amended complaint that the mortgage attached to it was the one that plaintiff wanted to be executed. It was, for some reason, the improper exhibit was attached to the complaint. But there was no effort to try to enforce a, or seek to enforce a separate mortgage. And I'd like to just clarify a statement I made in my opening and picked up in the response. I said the operative agreement here is the document correction agreement, because that's the agreement that we're asking the court to enforce. Enforcement of that would be the execution of a mortgage. But I didn't mean to just displace the importance of the mortgage. My point is that the specific performance count goes to the specific performance of the agreement. All right, Mr. Vukovic, your time is up. Okay, great. All right. Well, any questions on that, Justice Brennan? No questions, thank you. Justice Hudson? No, I have no further questions. And I have no questions. The court thanks both parties for the quality of your arguments this case. The written decision will be issued in due course. The court stands in recess until the next case is called. Justice Brennan, Justice Hudson, I will initiate the call. Thank you. Thank you.